against other defendants, [Birdsall v. McDonald, Case No. 1,434,] and it is admitted that the defendants in this suit are using the same machine that, in that case, was determined to be a violation of the complainant's patent. The defendants allege, however, that, if an opportunity be given, they can produce additional witnesses to establish the contrary of some of the facts found by the court in the Ohio suit, which would overthrow complainant's patent altogether, by showing its want of novelty. The complainant, however, is certainly now entitled to the benefit of the adjudication already had; and, though the defendants in this suit was not a party to the record in the various suits brought in other of the courts, where the validity of this patent was in controversy, yet, they contributed to the defence of such suits, and it would not be equitable, now to allow them to proceed to manufacture this patented article, because, they say, in their answer, they can produce more witnesses to testify to a particular fact already determined, which was in controversy, and touching which, they have already examined witnesses. Whatever may be the effect of this additional testimony, upon the case, at the final hearing, the complainant ought to have the benefit of his adjudicated rights, now. The injunction will be ordered, as prayed.

[NOTE. Patent No. 35,209 was granted to J. C. Birdsall May 13, 1862. For other cases involving this patent, see Birdsall v. McDonald, Case No. 1,434; Perrigo v. Spaulding, Id. 10,-994. For subsequent proceedings, to punish for a contempt in violating the injunction, see Case No. 1,436.]

## Case No. 1,434.

BIRDSALL v. McDONALD.

SAME v. ASHLAND MACH. CO.

[1 Ban. & A. 165; 6 O. G. 682; Merw. Pat. Inv. 450.][1]

Circuit Court, N. D. Ohio. April Term, 1874.

PATENTS—ABANDONMENT—FORFEITURE BY PUBLIC USE — REISSUE — CONCLUSIVENESS OF COMMISSIONER'S DECISIONS—IMPEACHMENT FOR FRAUD — SEED HULLING MACHINE — LEGITIMATE COMBINATION—PROOF OF NOVELTY.

1. A patentee cannot be charged with having abandoned his invention, where the application was not filed in the patent office, for more than two years after it was sworn to, during all which time the solicitors had the application, model, and requisite funds in their hands, but neglected to file the application, and the patentee was ignorant of such neglect.

[Cited in Henry v. Francestown Soapstone Stove Co., Case No. 6,382, 2 Fed. 81.]

2. Public use in good faith, for experimental purposes, and for a reasonable period, more than two years before applying for a patent, cannot affect the rights of the inventor. The objection rests upon the principle of forfeiture, and is not to be favorably regarded. Every rea-

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission. Merw. Pat. Inv. 450, contains only a partial report.]

sonable doubt should be raised against it. But if clearly established. it is fatal.

[Followed in Henry v. Francestown Soapstone Stove Co., Case No. 6,382.]

[See Sisson v. Gilbert, Case No. 12,912; Jones v. Sewall, Id. 7,495; Locomotive Engine Safety Truck Co. v. Pennsylvania R. Co., Id. 8,453; Henry v. Francestown Soapstone Stove Co., Id. 6,382; Sinclair v. Backus, 4 Fed. 539; Roberts v. Schreiber, 2 Fed. 855; Campbell v. Mayor, etc., 9 Fed. 500; Railway Reg. Manuf'g Co. v. Broadway & S. A. R. Co., 22 Fed. 655; Innis v. Oil City Boiler Works, 41 Fed. 788; Stanley v. Hewitt, Case No. 13,285; McMillan v. Barclay, Id. 8,902.]

3. The decision of the commissioner of patents, in awarding a reissue is prima facie correct in all cases, and it is conclusive, unless impeached for fraud, or unless it is clear, upon the face of the several specifications, that the reissue is not for the same thing as the original patent.

[See Allen v. Blunt, Case No. 217; Swift v. Whisen, Id. 13,700; Jordan v. Dobson, Id. 7,519; American N. Pavement Co. v. Elizabeth, Id. 311; Klein v. Russell, 19 Wall. (86 U. S.) 433; American M. P. Co. v. Atlantic Milling Co., Case No. 306; Miller & Peter's Manuf'g Co. v. Du Brul, Id. 9,597; Flower v. Rayner, 5 Fed. 793.]

4. A reissued patent can be impeached on the ground of fraud, only by bill in equity in an independent proceeding had directly for that purpose. in the name and by the authority of the United States. Citing Rubber Co. v. Goodyear, 9 Wall. [76 U. S.] 788; Mowry v. Whitney, 14 Wall. [81 U. S.] 434.

5. A combination is legitimate, when all the elements co-operate in producing a result, and are necessary to it, though their several functions are not performed simultaneously, but in immediate succession.

[Cited in Stilwell & Bierce Manuf'g Co. v. Cincinnati Gaslight & Coke Co., Case No. 13,453; National Progress Bunching Mach. Co. v. John R. Williams Co., 44 Fed. 192. See, also, Forbush v. Cook, Case No. 4,931; Swift v. Whisen, Id. 13,700; Hoe v. Cottrell, 1 Fed. 597; Hoffman v. Young, 2 Fed. 74; Wood v. Packer, 17 Fed. 650; Bradley, etc., Manuf'g Co. v. Charles Parker Co., Id. 240.]

6. The superiority of an alleged invention in utility and effect, over what had gone before it, is proof, tending to establish the fact of novelty.

[See Judson v. Cope, Case No. 7,565; Smith v. Nichols, Id. 13,084; Eames v. Cook, Id. 4,239; Many v. Sizer, Id. 9,056.]

7. The reissued patent granted to John C. Birdsall, numbered 1,299, held valid.

[In equity. Bills by John C. Birdsall against A. McDonald, and by the same against the Ashland Machine Company, for infringement of letters patent No. 20,249, and reissue of the same, No. 1.299, granted, respectively, to complainant May 18, 1858, and April 8, 1862, and of letters patent No. 35,209, granted to complainant May 13, 1862. Decree for complainant.]

S. S. Fisher, for complainant.

George Willey and George Rix, for defendants.

Before SWAYNE, Circuit Justice, and WELKER, District Judge.

SWAYNE, Circuit Justice. These are suits in equity founded upon certain patents issued to complainant, touching machinery for getting out clover-seed. Except in one particular, hereafter mentioned, the bills in both cases contain the same allegations. The parties agree as to the state of the art, down to the period of the alleged inventions of the complainant.

Before that time clover-heads were detached from the stems, preparatory to hulling, by the tramping of horses, by thrashing with flails, by cutting with cradles, (the two first fingers being covered with canvas and the heads cut off near the place of their attachment to the stems,) by removing the heads in the field by an instrument known as a stripper, and, after mowing, by ordinary thrashing machines. The heads were also sometimes detached by a machine designed specially for that purpose. Hulling out the seed was a distinct process. This was usually done by a machine used for that purpose alone. Machines for thrashing and those for hulling were frequently worked at the same time, side by side.

These instrumentalities were irrespective of the machines to which our attention has been called by the learned counsel for the defendants. They were intended, it is claimed, each to combine the processes of detaching the heads, hulling out the seeds, and removing the chaff, without the aid of any other instrumentality.

In regard to the date of the complainant's original invention, the proofs satisfy us of the following facts: He made his first combined thrashing and hulling machine in the summer, or fore part of the fall, of the year 1855. It was not entirely successful. It cut the seeds to some extent, and had other defects subsequently corrected. He made one or two more machines in the year 1856. His model for the patent office was completed about the 1st of December, 1855. He made oath to his application for a patent January 19, 1856. He exhibited a machine at the State Fair at Buffalo in 1857, and took the first premium.

There is some conflict in the testimony as to this branch of the case, but it is much less than is usual where the invention involved is so important, where the adverse interests are so numerous and potent, and where the preparation for the defense has been so thorough. The effect of the evidence is such as to leave no doubt in our minds upon the subject.

There is no foundation for the objection that the invention was abandoned to the public. The measures taken by the complainant to procure a patent, and its subsequent issue, are conclusive against the proposition. It is true the application was not filed in the patent office until the 3d of February, 1858, more than two years after it was sworn to; but the delay was owing to the remissness of the agents, to whom the business of procuring the patent was confided. They had the application, the model, and the requisite funds in their hands

during all the intervening time. The complainant was ignorant of their neglect, and should not be held responsible for the delay that occurred. He sold no machine prior to two years before the filing of the application. He used the one first made publicly, but to what extent and under what circumstances, is not clearly shown by the evidence. It is shown that the use, whether more or less, was tentative, and that, by the light of experience thus acquired he made the subsequent and better ones. Public use in good faith for experimental purposes and for a reasonable period, even before the beginning of the two years of limitation, cannot affect the rights of the inventor. The objection rests upon the principle of forfeiture, and is not to be favorably regarded. Every reasonable doubt should be raised against it. But where either of the facts of this class, specified in the statutes, is clearly made out, the result is as if there had been the failure of condition precedent, and the defect is fatal to the patent. Neither a court of law nor a court of equity has any dispensing power. It is alike the duty of both to give full effect to the law. Neither can interpolate a qualification with which congress has not seen fit to temper the rules prescribed. The complainant is not barred by laches or acquiescence. The facts disclosed in the record are not such, we think, as to take away his right to maintain these suits. The complainant's bill against McDonald and others is founded upon two patents, reissue No. 1,299 and the original patent, No. 35,209. The bill charges the defendants in that case with infringing all the claims, three in number, of the reissue, and the third claim of the original patent.

As regards the reissue, the case is the same as to the defendants in both suits. The third claim of No. 35,209 is as follows: "The spiral conveyer W' in combination with the hulling cylinder, for distributing the tailings from the elevator uniformly to the feed rolls and hulling cylinder."

As to this claim, we deem it sufficient to remark that the evidence has failed to satisfy us of its originality with the complainant, or its infringement by the defendants, as alleged.

The subject is of little importance as compared with the issues arising under the other patent. We shall, therefore, say nothing further upon the subject. The bill must be dismissed as to this claim.

In the specifications of the original patent No. 20,249, issued May 18, 1858, of which No. 1,299 is a reissue, the invention is described as consisting of "certain new and useful improvements in machines for thrashing and hulling clover." The claim is as follows: "Having thus described my invention, what I claim therein as new and desire to secure by letters patent, is the arrangement of the slatted belt b b, with the bolt B B', table T, thrashing cylinder D, hulling cylinder L, and fan F, the whole operating in the manner and for the purpose substantially as set forth."

In the specifications of the reissue the patentee says: "Be it known that I * * * have invented a new and useful machine for thrashing clover, to separate the seed, hull, and clean it at one operation, or in one machine. Prior to my invention, clover was thrashed by a machine which only separated the seed, with the hulls on it, from the straw and heads, and the seed was taken by manual labor, and put into another machine of a different construction, to remove the hulls and cleanse the seed. The object and purposes of my invention and improvements have been to make a machine, which would thrash the clover and separate the seed from straw or stalks and heads, remove the hulls from the seed, and clean it ready for use or market. And I have succeeded in making a machine which will thrash, hull, and clean more than twice, and nearly three times, as fast as it has been done heretofore, with the same or a given quantity of labor and power. The nature of my invention and improvements in machines for thrashing clover, and hulling and cleaning the seed, consists in arranging and combining in one machine the cylinder which thrashes the bolls and seed from the straw or stalks, and the cylinder which hulls the seed, so that the bolls and seed thrashed may be separated from the straw or stalks, and conveyed from the thrashing to the hulling cylinder, and the seed hulled before it passes out of the machine; and in combining with the above a bolting or screening and conveying apparatus, to separate the bolls and seed from the straw or stalks, and deliver them to the hulling cylinder; also in combining with the thrashing and hulling cylinders a screening and fanning apparatus, to separate the hulls or bolls, and clean the seed after it leaves the hulling cylinder."

He then proceeds to give a full and clear description of the machine and of the mode of constructing it, and concludes as follows: "I will now state what I desire to secure by letters patent, to wit: I claim the arranging and combining in one machine the cylinder which thrashes the bolls and seed from the straw or stalks, and the cylinder which hulls the seed; so that the bolls and seed thrashed may be hulled before it (the seed) passes out of the machine. And in combination with the thrashing and hulling cylinders, above claimed, I claim the bolting or screening and conveying apparatus, which separates the bolls and seed from the straw or stalks and delivers them to the hulling cylinder. And in combination with the thrashing and hulling cylinders, I claim the screening and fanning apparatus, which separates the hulls or bolls, and cleans the seed, after it leaves the hulling cylinder."

It is objected that the reissue is broader than the original patent, and, therefore, void.

The commissioner of patents awarded the reissue. The subject was placed by the law within his jurisdiction. His decision is to be held prima facie correct in all cases, and

it is conclusive, unless impeached for fraud, or unless it is clear upon the face of the several specifications, that the reissue is not for the same thing as the original patent. Where a remedy is sought for fraud, it must be in an independent proceeding had directly for that purpose by a bill in equity in the name and by the authority of the United States. Rubber Co. v. Goodyear, 9 Wall. [76 U. S.] 788; Mowry v. Whitney, 14 Wall. [81 U. S.] 434.

Inventors are a meritorious class of men. They are not monopolists in the odious sense of that term. They take nothing from the public. They contribute largely to its wealth and comfort. Patent laws are founded on the policy of giving to them remuneration for the fruits, enjoyed by others, of their labor and their genius. Their patents are their title deeds, and they should be construed in a fair and liberal spirit, to accomplish the purpose of the laws under which they are issued. We have examined carefully the specifications of both patents, and are satisfied that the commissioner decided correctly.

It is further objected that the reissue is for a mere aggregation of old things—that the aggregation involved nothing of invention, and was without merit, and, therefore, not patentable.

The slightest examination of the specifications, the model, and the evidence will at once dispose of this illusion. The machine, though made up of several elements, is a unit. Its purpose is to get out clover seed and prepare it for use. All its parts co-operate for that result, and are necessary to that end. Without either there will be a failure to the extent of the function which it performs, and the work intended to be accomplished would be imperfectly done. It is not necessary that every function should be performed simultaneously. Their connection and operation, as in this case, in immediate succession is sufficient. There is no analogy between this case, and the one relied upon by the counsel for the defendants as authority upon the subject.

In order to consider intelligently the questions of novelty and infringement, it is necessary to determine, in advance, the proper construction of the patent. It is for improvements upon pre-existing machines. This is its most prominent point. The improvements are in the combinations described. The parts are old. There is nothing new in any of them. The novelty lies in combining them in the manner set forth, and in the striking and valuable effects thus produced. We agree with the counsel for the defendants, that we are to look to the body of the specification for the intermediary and auxiliary means of giving to the things claimed as the complainant's invention, operative effect, but we do not agree with them in the inference they draw from this proposition.

The specific claims set up are: 1. The combination of thrashing and the hulling cylin-ders. 2. In combination with these, the bolting, screening, and conveying apparatus, which, operating between the thrashing and the hulling cylinder, supplies the latter with the material upon which its function is to be wrought. 3. In combination, also, with the two cylinders, the screening and fanning apparatus.

If any machine, of practical success and value, having these combinations, was "known and used by others before" the complainant completed his invention, then his patent is void. If, on the other hand, there had been no such machine, his patent is valid; and, in such case, every machine since constructed, having substantially the same combinations, though not using the same instrumentalities, but, instead of them, mechanical equivalents older than the invention, is a violation of his rights. This proposition assumes that the machine of the complainant was a success. The proof shows that it was a great and brilliant one. The result of his invention was his, and another cannot appropriate it, by merely changing the form and shape of the appliances employed. That these appliances had long been known in the state of the art, and that those employed by the patentee are of the same character, is immaterial. It is the combinations, and their new effect, that are to be regarded. Any change merely colorable, involving no new idea, requiring not invention, but only mechanical skill, to make it, a change which retains the idea of the patentee and the substance of his invention, notwithstanding the different drapery in which that substance is clothed, cannot avail to protect a party charged with infringement.

The superiority of an alleged invention in utility and effect, over what had gone before it, is proof tending to establish the fact of novelty.

If the views we have expressed as to the construction of the patent, and the rules we have laid down upon the subject of infringement, are correct, it will hardly be denied, if the patent is valid, that the defendants have offended as charged in the bills.

Viewing the subject from this standpoint, no question was raised by the counsel for the defendants in the discussion before us. The main stress of their argument was upon two propositions: That the patent was void for want of novelty: that if it were not void, the patentee having used instrumentalities, all of which were old, in making his combinations, the defendants had a right to use other and different old instrumentalities in the same way and for the same purpose.

We shall forbear to examine in detail the evidence relating to the second proposition. In our view it supports fully the complainant's allegations, and brings the case within the rules we have laid down upon the subject. The question of novelty is the only one about which we have felt any difficulty. At first the defence struck us as formidable,

Reflection and a full examination of the evidence has removed all doubt from our minds and enabled us to reach a satisfactory conclusion. It is insisted that the complainant's alleged invention, was anticipated by what was designated in the argument as: The machine of Hizer: the machine of Rowe: the machine of Mathews & Hale: the machine of Hathaway; the machine of Feezler.

The argument before us was directed chiefly to the two machines first mentioned, and our remarks will be confined to them. The question relating to the Hizer machine was before the commissioner when he granted the reissue. His opinion upon that occasion is in evidence. He says: "It only requires an inspection of these (the model and drawing) to show that this machine never had, and never was intended to have, a thrashing cylinder. The Hizer machine was designed to take the clover heads, after they had been separated from the straw, and hull them. It was a huller, and not a thrasher and huller."

A large number of witnesses were examined on both sides. This view, we think, is sustained by a very decided preponderance of the evidence. France testifies that the upper cylinder was a picker with wooden pins, and merely picked the chaff apart. He and thirteen others testify that the heads were tramped or thrashed off before they were fed to the machine. None of the witnesses examined had better means of knowledge or are more trustworthy than these. Ten of them testify that they saw the machine in use, and that it had but a single cylinder. The machine was used for one of them—Patterson. He saw the first combined machine he ever saw, the October before his deposition was taken.

Crites, another of them, says, he ran a machine on shares with Hizer two seasons—1847 and 1848. He says the heads were thrashed or tramped off and fed to the machine with a scoop or shovel. He never knew of Hizer building a machine with two cylinders, and he never saw a machine with two cylinders, until the Monday before he was examined.

C. H. Lizor furnished Hizer with money to enable him to get his patent, and got one of the machines. It had but one cylinder. George H. Lizor helped Hizer to make his model. It had one cylinder. He first heard of a combined machine two years before he testified.

Heck manufactured the machines in the summer and fall of 1847. They had one cylinder. They did not prove successful, and the manufacture was abandoned. Allen Smith worked with Heck, and his testimony is to the same effect. He first heard of a combined machine in 1858 or 1859.

Knox saw a picker on the machine. Hizer took it off and laid it away before the machine was used. Mowray testifies that the picker was a failure, and was removed.

Mrs. Hizer, the widow of the patentee, was well acquainted with the machine. Her testimony is clear upon the subject. She says: "The first machine had a roller on top, a picker they called it. Well, then the clover got tangled with the roller on top, so they could not work with that on. Then it worked and cleaned the seed after he took that off." By that she says she means the picker. She says further, that the picker was taken off the day Hizer began to use the machine.

Comment is unnecessary. There is some conflicting evidence, but it fails to neutralize the effect of that to which we have adverted.

The patent issued to Rowe is in evidence. It is dated April 30, 1861, nearly three years after the emanation of the patent to the complainant. The defendants rely, of course, not upon the patent to Rowe, but upon machines used by him at different periods from 1845 to 1857. The complainant's counsel admit, that, during that time, Rowe did make and use two or three machines with two cylinders, but he insists that they were both hullers; that neither was a thrasher; that the machines were experimental, were failures, and that they were finally abandoned. The defendants examined eleven witnesses, and the complainant fifteen. We shall advert to only so much of the evidence taken, as we deem material for the purposes of this opinion, giving the names of the several witnesses in connection with a brief resumé of their testimony, respectively.

Henry C. Smale, age 63, farmer in West Virginia, had a Rowe machine to thrash clover seed for him in 1855 and for two or three years thereafter. The machine was run by Bender & Hyeronymous. It did not work at all. He had a great deal of trouble with it. It left about one-third of the seed in the straw. The clover was gathered with a cradle which had three fingers and a trough.

John B. Tites had a Rowe machine thrash for him in 1852. It had two cylinders. It thrashed slow, gave trouble about choking, and ground the seed. The first day it thrashed three and a half bushels. Don't know whether this was an average day's work. The best and plumpest of the seed were broken and of no account.

Jacob Wolf saw the Rowe machine in 1847. First had a single huller. First change Rowe made was by adding the screen; then the second cylinder or stemmer that knocked the seed off the straw. Heard Colonel Lucas tell Rowe, when he attached the second cylinder, to get out a patent. Rowe said he did not want a patent as the machine then was. An average day's work, before the extra cylinder was added, was from three to five bushels. After the second cylinder was added, the machine did not thrash so much. The upper cylinder hulled out considerable seed when the clover was dry.

A. J. Read.—He used one of Rowe's machines in 1850. It had two cylinders. The

machine separated the hulls from the straw. The second cylinder hulled the seed. Some days the machine thrashed twelve bushels, but the seed was dirty and had to be sifted; he never saw any clean seed from the machine. Some days it did not thrash more than a bushel; some days the machine thrashed without breaking the seed; some days they were broken very much. Rowe often said he did not consider the machine "a genuine one," but expected to perfect it. The clover was sometimes prepared by stripping and sometimes by cradles.

Michael Wolf.—He tried a Rowe machine in 1848, and could not make it work. The seed was broken so much that Rowe would not let him hull any more. He finished that job, and several others that had been begun, with a Fitz machine with one cylinder.

George W. Spotts knew of one of Rowe's double cylinder machines in 1855. The machine was taken to Scavel's, and left there to rot. "Rowe was most invariably altering his machines, and often told me he could perfect a better machine. The war broke out and broke the old gentleman up. He never succeeded."

B. W. Kanode.—The Rowe machine got out from four to six bushels of seed per day. The seed was cut.

Samuel Walton.—Rowe stated that the machines he had been working, up to the time he got his patent in 1861, were experimental. Did not consider them perfect. That he had made numerous changes in that time. He said that he did not consider any of his machines, up to that time, worth getting a patent for.

Hiram King.—Resides at Hagerstown, Maryland. Is a wheelwright. Became acquainted with Rowe in 1847 or 1848. He was then running a huller. Worked for him in 1847 in repairing an old two-cylinder machine. Worked for him again in 1858 upon an old machine, and assisted him in building a new one. "Q. 45.—Do you know anything of the practical working of the old two-cylinder machine? A. I do; as far as my judgment about machinery, they were not practical machines."

There is other testimony, more favorable to the machine, but it fails to repel the force of that to which we have referred. There is also proof of the defective working of a two-cylinder Rowe machine reproduced, and expert testimony taken by the complainant. We do not deem it necessary particularly to advert to either.

Let the Rowe machine, as described by all the witnesses, be contrasted with the machine of the complainant. The latter is capable of thrashing and hulling out, and cleaning and preparing thoroughly, the seed for the market. Its superiority lies alike in the quantity and the quality of the work which it performs. We think the Rowe machine was experimental, imperfect, and of no practical value.

The line of demarkation between the Birdsall machine and those that went before it, is that which separates success from failure. There can be no better proof of this than the crowd of imitations which have followed the invention of the complainant.

There is less ground for claiming that either of the other machines, which have been mentioned, is a defence for the defendants, than that those are, which have been considered. The testimony of Davis and Schuyler, under the circumstances, requires no remark. We hold that the attack on the patent for want of novelty has failed.

It appears in the evidence that there was a struggle between these parties upon this question, before the commissioner, when the patent was extended. The proceeding was ex parte. We have considered the case as if no such contest had occurred.

A decree will be entered in each case in favor of the complainant, in the usual form, for an injunction, for an account, and for costs.

[NOTE. Patent No. 20.249 was granted to J. C. Birdsall, May 18, 1858; reissued April 8, 1862, (No. 1,299.) For other cases involving this patent, see Birdsall v. Hagerstown Agr. Imp. Co., Cases Nos. 1,433, 1,436, and 1,437; Birdsell v. Shaliol, 112 U. S. 485, 5 Sup. Ct. 244; Birdsall v. Perego, Case No. 1,435; Perigo v. Spaulding, Id. 10,994.]